## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

_____

ENVIRONMENT AMERICA, INC.
d/b/a ENVIRONMENT TEXAS and
SIERRA CLUB,

      Plaintiffs,                         Civil Action No.:

            v.

PASADENA REFINING SYSTEM, INC.,

      Defendant.
_____

## COMPLAINT

## INTRODUCTION

1.  This is a citizen enforcement suit brought by non-profit environmental organizations, on behalf of their individual members, against Pasadena Refining System, Inc. ("PRSI") to redress and prevent ongoing federal Clean Air Act ("CAA" or "Act") violations that negatively affect the health and lives of residents by exposing them to harmful air pollutants.

2.  PRSI owns and operates a petroleum refinery in Pasadena, Texas (the "Refinery").

3.  PRSI has permits issued by the Texas Commission on Environmental Quality ("TCEQ") that govern the emission of air pollutants from the Refinery.  These permits were issued pursuant to the CAA and state laws and regulations implementing the CAA.

4.  PRSI has repeatedly violated and is still violating its air emission permits and the CAA at the Refinery, and will continue to violate absent relief from this Court.

5.  PRSI's violations include emissions of particulate matter, sulfur dioxide, nitrogen oxides, carbon monoxide, and volatile organic compounds in excess of numeric emission limits contained in its permits.

6.  PRSI has a history of such violations that extends back before the applicable statute of limitations period in this case.  That statute of limitations period begins on December 22, 2011, five years prior to service of the pre-suit notice.

7.  Violations of PRSI's permits constitute violations of the CAA.

8.  Plaintiffs intend this action to encompass post-Complaint violations of the types alleged.

9.  Neither the federal government nor the state of Texas has taken enforcement action or other regulatory action sufficient to prevent PRSI from violating the Act.

## THE CITIZEN SUIT PROVISION OF THE CLEAN AIR ACT

10.  Congress has declared that the purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).

11.  In the "citizen suit" provision of the CAA, Congress authorized any person to commence a civil action against any person who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of an "emission standard or limitation" as defined in the CAA.  42 U.S.C. § 7604(a)(1).

12.  The CAA defines each of the following as an "emission standard or limitation" under the CAA:

a.    any standard or limitation established "under any permit issued under Title V of the CAA" (42 U.S.C. § 7604(f)(4));

b.      "any permit term or condition" (42 U.S.C. § 7604(f)(4));

c.      "any standard or limitation established under an applicable State Implementation Plan" (42 U.S.C. § 7604(f)(4));

d.      any "emission limitation, standard of performance or emission standard…which is in effect under this chapter" (42 U.S.C. § 7604(f)(1)); and

e.      "any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment)" (42 U.S.C. § 7604(f)(3)).

13.  Under the Clean Air Act, a State Implementation Plan ("SIP") is a plan developed at the state level that sets forth how the state will achieve and maintain compliance with National Ambient Air Quality Standards ("NAAQS") set by the United States Environmental Protection Agency ("EPA") to protect human health and the environment.  SIPs must meet certain federal criteria and are subject to approval by EPA.  Texas has an EPA-approved SIP.  As part of Texas' obligations under its SIP, TCEQ issues to stationary sources of air pollution, such as the Refinery, permits that are intended to implement the CAA's Prevention of Significant Deterioration ("PSD") program, Part C of Subchapter I of the Act, 42 U.S.C. §§ 7474-7492, and New Source Review ("NSR") program, Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515.

14.  The CAA citizen suit provision provides United States District Courts with jurisdiction to "enforce" emission standards and limitations.  42 U.S.C. § 7604(a).

## PARTIES

### Environment Texas and Sierra Club

15.   Plaintiffs bring this suit on behalf of their individual members who are adversely affected by the Refinery's excess emissions of particulate matter, sulfur dioxide, nitrogen oxides, carbon monoxide, volatile organic compounds, and other pollutants in violation of the Act. These violations have deleterious impacts on public health and the environment in the areas Plaintiffs' members live, work, and recreate.

16.   Plaintiff Environment America, Inc., a Colorado non-profit corporation that in Texas does business as Environment Texas ("Environment Texas"), has approximately 180,000 members nationwide and over 4,000 members in Texas, including approximately 200 members in Harris County.

17.   Environment Texas advocates for clean air, clean water, and the preservation of Texas' natural resources.

18.   Among other activities in pursuit of these goals, Environment Texas researches and distributes analytical reports on environmental issues, advocates before legislative and administrative bodies, engages in litigation, and conducts public education programs.

19.   Sierra Club, a California non-profit corporation with an office in Austin, is the nation's oldest and largest conservation organization, with approximately 1.3 million members nationwide.  The Lone Star Chapter has approximately 24,000 Texas members, including nearly 5,000 members in Harris County, who are dedicated to exploring, enjoying, and protecting Texas' natural resources and wild places.  Sierra Club promotes the responsible use of the earth's ecosystem and resources, and works to restore the quality of the natural and human environment. In addition to organizing nature outings and public education campaigns, Sierra Club and its

Texas members pursue advocacy and litigation on issues including clean air and clean water, solid waste reduction, and sustainable energy and land use policies.

20.  "Person" in the CAA is defined to include "corporation."  42 U.S.C. § 7602(e). Plaintiffs are corporations and thus "persons" under the CAA.

**Pasadena Refining Systems, Inc.**

21.  PRSI is a corporation.

22.  PRSI is a "person" under 42 U.S.C. § 7602(e) of the CAA.

23.  PRSI is a refiner and marketer of petroleum products.

24.  PRSI owns the Refinery.

25.  PRSI operates the Refinery.

26.  PRSI is a subsidiary of Petrobras International Brasperto B.V.  Petrobras International Brasperto B.V. owns 100% of PRSI.

27.  Petrobras International Brasperto B.V. is a subsidiary of Petroleo Brasileiro S.A. – Petrobras ("Petrobras").

28.  On page 57 of Petrobras' 2015 Annual Report on Form 20-F filed with the United States Securities and Exchange Commission, Petrobras stated, "In the United States we own 100% of the Pasadena Refining System Inc., and 100% of its related trading company PRSI Trading, LLC."

29.  Petrobras is the largest multinational corporation in South America.

30.  Petrobras is one of the world's largest integrated oil and gas companies.

31.  Petrobras' audited consolidated statement of financial position includes information regarding the assets, liabilities, and income of PRSI, among other information regarding PRSI.

32.  Petrobras took sole control of PRSI in 2012.

33.  Before Petrobras took sole control of PRSI in 2012, 50% of PRSI was owned by Astra Oil Trading, NV, and affiliated entities ("Astra") and 50% was owned by Petrobras America, Inc., and affiliated entities.

34.  In 2005 Astra reportedly purchased PRSI for approximately $42.5 million.

35.  In 2006 Petrobras purchased a 50% interest in PRSI from Astra for $360 million.

36.  In 2012 Petrobras purchased the remaining 50% interest in PRSI from Astra for $820.5 million.

37.  Petrobras formed a commission in 2014 to evaluate aspects of its acquisition of the Refinery.

38.  Petrobras is being investigated by Brazilian authorities for corruption.

39.  Brazilian authorities are investigating Petrobras as part of their investigation into the corruption scandal known as "Operation Carwash."

40.  Law firms hired by Petrobras are conducting an independent investigation into Operation Carwash allegations.

41.  In connection with the independent investigation into the Operation Carwash allegations, the law firms hired by Petrobras are investigating allegations that Petrobras' acquisition of the Refinery generated bribes for ex-Brazilian senator Delcidio Amaral, lobbyist Fernando "Baiano" Soares, and Petrobras' former Refining, Transportation and Marketing Officer Paulo Roberto Costa, among others.

**JURISDICTION, VENUE AND NOTICE**

42.  This Court has jurisdiction over the subject matter of this action pursuant to section 304(a) of the Act, 33 U.S.C. § 7604(a), and pursuant to 28 U.S.C. § 1331.

43.   The citizen suit provision of the Act grants jurisdiction to the United States District Courts to "enforce" CAA emission standards and limitations, to issue an injunction remedying violations of the Act, and to impose appropriate civil penalties, and authorizes an award of costs of litigation (including reasonable attorneys' and expert witness fees).

44.   Pursuant to 28 U.S.C. § 2201(a) this Court may issue a declaratory judgment determining that PRSI has violated its permits and the CAA, and determining the number of days of violations PRSI has committed.

45.   Venue lies in this District pursuant to section 304(c)(1) of the CAA, 42 U.S.C. § 7604(c)(1), because the Refinery is a stationary source, or a collection of stationary sources, located within this District.

46.   On December 22, 2016, counsel for Plaintiffs mailed a letter of that date (the "Notice Letter") by certified mail, return receipt requested, to Fernando F. Oliveira, Chief Executive Officer of PRSI, and John Edmunds, Chief Operating Officer and Director of Operations of PRSI.  A copy of the Notice Letter is attached as Exhibit 1.  The Notice Letter is incorporated by reference herein.

47.   Mr. Oliveira and Mr. Edmunds received the Notice Letter.  Copies of return receipts for Mr. Oliveira and Mr. Edmunds are in Exhibit 2, attached hereto.

48.   On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to Registered Agent Solutions, the registered agent for PRSI in Texas.  Registered Agent Solutions received the Notice Letter.  A copy of the return receipt for Registered Agent Solutions is in Exhibit 2.

49.   On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to Gina McCarthy, Administrator of the United States

Environmental Protection Agency ("EPA").   A copy of the return receipt for EPA is in Exhibit 2.

50.  On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to Ron Curry, Regional Administrator for EPA Region VI.  A copy of the return receipt for the Regional Administrator of EPA Region VI is in Exhibit 2.

51.  EPA did not communicate with Plaintiffs regarding the Notice Letter prior to the filing of this Complaint.

52.  On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to the Governor of Texas, Greg Abbott.   A copy of the return receipt for Mr. Abbott is in Exhibit 2.

53.  Neither Mr. Abbott nor his office communicated with Plaintiffs regarding the Notice Letter prior to the filing of this Complaint.

54.  On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to Richard A. Hyde, Executive Director of the Texas Commission on Environmental Quality ("TCEQ").   A copy of the return receipt for Mr. Hyde is in Exhibit 2.

55.  On December 22, 2016, counsel for Plaintiffs mailed a copy of the Notice Letter by certified mail, return receipt requested, to Steve Hagel, Deputy Director, Office of Air, Texas Commission on Environmental Quality ("TCEQ").   A copy of the return receipt for Mr. Hyde is in Exhibit 2.

56.  TCEQ did not communicate with Plaintiffs regarding the Notice Letter prior to the filing of this Complaint.

57.  The Notice Letter satisfies the pre-suit notice requirements of the CAA, as set forth in 42 U.S.C. § 7604(b).

58.  As of the date of the filing of this Complaint, neither EPA nor TCEQ has commenced a civil action against PRSI in court to enforce any of the emission standards or limitations that Plaintiffs allege are being violated at the Refinery.

59.  At or around the time this Complaint was filed, Plaintiffs served a copy of it on the U.S. Attorney General and the Administrator of EPA, pursuant to 42 U.S.C. § 7604(c).

## THE REFINERY AND THE SURROUNDING COMMUNITY

60.  The Refinery is located at 111 Red Bluff Road, Pasadena, Texas.

61.  The Refinery is located in Harris County.

62.  A residential area is located approximately 1,500 feet south of the Refinery's southern property line.

63.  A school is located approximately 3,400 feet to the south-southwest of the Refinery's property line.

64.  The Refinery produces gasoline, distillates (diesel, home heating oil, jet fuel and kerosene), petroleum feed stocks, slurry oil, and petroleum coke.

65.  The Refinery has a crude oil capacity of just over 100,000 barrels per day.

66.  From time to time the Refinery has emitted particulate matter into the atmosphere. The size of the particles that have been emitted into the atmosphere from the Refinery has varied.

67.  The Refinery has emitted into the atmosphere particles that have measured more than 10 microns.

68.  The Refinery has emitted into the atmosphere particles that have measured 10 microns or less ("$PM_{10}$").

69.   The Refinery has emitted into the atmosphere particles that have measured 2.5 microns or less.

70.   One of the process units at the Refinery is a Fluid Catalytic Cracking unit ("FCC Unit").

71.   The FCC Unit uses a catalyst as part of the refining process.

72.   At the Refinery, PRSI has used a catalyst for the FCC Unit containing silica alumina.

73.   From time to time the Refinery has emitted FCC Unit catalyst into the atmosphere.

74.   The Refinery has emitted catalyst into the atmosphere in the form of particulate matter.

75.   The size of the particles that have been emitted into the atmosphere from the Refinery has varied.

76.   The Refinery has emitted into the atmosphere catalyst particles that have measured more than 10 microns.

77.   The Refinery has emitted into the atmosphere catalyst particles that have measured 10 microns or less.

78.   The Refinery has emitted into the atmosphere catalyst particles that have measured 2.5 microns or less.

79.   A fire broke out at the Refinery on September 30, 2011.

80.   A fire broke out at the Refinery on December 10, 2011.

81.   An explosion occurred at the Refinery on March 5, 2016.

82.   The Washburn Tunnel, which connects Pasadena and Galena Park, and the Houston Ship Channel were closed as a result of the March 5, 2016, explosion at the Refinery.

83.  On July 25, 2016, a recommendation to "shelter-in-place" was issued for residents of Galena Park.  The July 25, 2016, shelter-in-place recommendation was issued in response to a July 25, 2016, chemical release at the Refinery.  A portion of the Washburn Tunnel and Houston Ship Channel were closed as a result of the July 25, 2016, chemical release from the Refinery.

## THE REFINERY'S PERMITS

84.  PRSI applied to TCEQ for permission to emit pollutants from the Refinery.

85.  From time to time, PRSI applied for, and TCEQ has issued, amendments to the permits TCEQ has issued to PRSI.  Paragraphs 86-197, below, refer to permits issued by TCEQ and any amendments thereof.

86.  TCEQ issued permits to PRSI that authorize the Refinery to emit certain pollutants from the Refinery.

87.  TCEQ issued permits to PRSI that limit the amounts of the pollutants that PRSI is authorized to emit from the Refinery.

88.  TCEQ issued permits to PRSI that specify the sources from which authorized pollutants may lawfully be emitted from the Refinery.

89.  TCEQ issued permits to PRSI that limit, by emission source, the hourly rate (in pounds per hour) at which authorized pollutants may lawfully be emitted from the Refinery.

90.  TCEQ determined that "[h]ourly emission limits are necessary in order to ensure protection of public health from short-term exposure."  36 Tex. Reg. 943, 950 (February 18, 2011).

91.  TCEQ issued permits to PRSI that limit, by emission source, the annual rate (in tons per year) at which authorized pollutants may lawfully be emitted from the Refinery.

**Permit 56389**

92.   PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's East Flare.

93.   PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's West Flare.

94.   PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Crude Unit.

95.   PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Alky Cooling Tower.

96.   In applying to TCEQ for permission to emit certain pollutants from the Refinery's East Flare, West Flare, Crude Unit, and Alky Cooling Tower, PRSI provided information to TCEQ for the purpose of enabling TCEQ to calculate maximum allowable emission rates.

97.   TCEQ issued Air Quality Permit 56389 to PRSI ("Permit 56389").

98.   TCEQ issued Permit 56389 pursuant to the Texas SIP.

99.   PRSI accepted Permit 56389.

100.   PRSI did not appeal TCEQ's issuance of Permit 56389.

101.   PRSI understands that it is obligated to comply with the terms of Permit 56389.

102.   PRSI operates the Refinery with the understanding that Permit 56389 limits the emission of air pollutants.

103.   Permit 56389 limits the number of pounds of sulfur dioxide ("$SO_2$") permitted to be emitted per hour from the Refinery's West Flare.

104.  The number of pounds of $SO_2$ permitted to be emitted per hour from the Refinery's West Flare is set forth in the "Emissions Sources - Maximum Allowable Emission Rate table" ("MAERT") contained in Permit 56389.

105.  Permit 56389 limits the number of pounds of volatile organic compounds ("VOCs") permitted to be emitted per hour from the Refinery's East and West Flares.

106.  The number of pounds of VOCs permitted to be emitted per hour from the Refinery's East and West Flares is set forth in the MAERT contained in Permit 56389.

107.  Permit 56389 limits the number of pounds of VOCs permitted to be emitted per hour from the Refinery's Alky Cooling Tower.

108.  The number of pounds of VOCs permitted to be emitted per hour from the Refinery's Alky Cooling Tower is set forth in the MAERT contained in Permit 56389.

109.  Permit 56389 limits the number of pounds of VOCs permitted to be emitted per hour from the Refinery's Crude Unit.

110.  The number of pounds of VOCs permitted to be emitted per hour from the Refinery's Crude Unit is set forth in the MAERT contained in Permit 56389.

111.  PRSI is aware that General Condition 8 of Permit 56389 states, "**Maximum Allowable Emission Rates**.  The total emissions of air contaminants from any of the sources of emissions must not exceed the values stated on the table attached to the permit entitled 'Emission Sources--Maximum Allowable Emission Rates.'"

112.  PRSI operates the Refinery with the understanding that the total emission of air contaminants from the sources of emissions listed in Permit 56389's MAERT must not exceed the values stated on that table.

113.  PRSI makes a record of $SO_2$ and VOC emissions that exceed the limits in Permit 56389's MAERT, to the extent PRSI is aware of such emissions.

114.  Each of the emission limits in Permit 56389 described above is an emission standard or limitation.

115.  Each of the emission limits in Permit 56389 described above is a permit term or condition.

116.  Each of the emission limits in Permit 56389 described above is a condition or requirement of a permit issued under part D of subchapter I of the CAA (relating to nonattainment).

117.  Permit 56389 was issued under the Texas SIP.

118.  A violation of Permit 56389 is a violation of the CAA.

**Permit 20246**

119.  PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Fluid Catalytic Cracking unit ("FCC unit").

120.  PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Seal Pot.

121.  PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from an emission source named "CO Boiler" that are controlled by the Refinery's Electrostatic Precipitator ("ESP").  The ESP is an air pollution control device.

122.  In applying to TCEQ for permission to emit certain pollutants from the Refinery's FCC unit, Seal Pot, the source called CO Boiler, and ESP, PRSI provided information to TCEQ for the purpose of enabling TCEQ to calculate maximum allowable emission rates.

123.  TCEQ issued Air Quality Permit 20246 to PRSI ("Permit 20246").

124.  PRSI accepted Permit 20246.

125.  PRSI did not appeal TCEQ's issuance of Permit 20246.

126.  PRSI understands that it is obligated to comply with the terms of Permit 20246.

127.  PRSI operates the Refinery with the understanding that Permit 20246 limits the emission of air pollutants.

128.  Permit 20246 authorizes the emission of specified air pollutants, as described in paragraphs 129-34 below, from the Refinery's Seal Pot, which is designated as emission point number ("EPN") "VTFCC003", only during "cold start-up" operations.

129.  At all times other than during "cold start-up" operations, the emission of air pollutants from the Seal Pot is prohibited.

130.  Permit 20246 limits the number of pounds of particulate matter of 10 microns or less ("$PM_{10}$") permitted to be emitted per hour from the Refinery's Seal Pot.

131.  The number of pounds of $PM_{10}$ permitted to be emitted per hour from the Refinery's Seal Pot is set forth in the MAERT contained in Permit 20246.

132.  Permit 20246 limits the number of tons of $PM_{10}$ permitted to be emitted annually from the Refinery's Seal Pot.

133.  The number of tons of $PM_{10}$ permitted to be emitted annually from the Refinery's Seal Pot is set forth in the MAERT contained in Permit 20246.

134.  Permit 20246 does not permit any pollutants other than $PM_{10}$ to be emitted from the Seal Pot at any time, and no other authorized pollutants are listed in the MAERT for the Seal Pot.

135.  Permit 20246 limits the number of pounds of $PM_{10}$ permitted to be emitted per hour from the emission source called "CO Boiler," designated as EPN "HTBLR010", when emissions are controlled by the ESP.

136.  The number of pounds of $PM_{10}$ permitted to be emitted per hour from HTBLR010 when emissions are controlled by the ESP is set forth in the MAERT contained in Permit 20246.

137.  PRSI is aware that General Condition 8 of Permit 20246 states, "**Maximum Allowable Emission Rates**.  The total emissions of air contaminants from any of the sources of emissions must not exceed the values stated on the table attached to the permit entitled 'Emission Sources--Maximum Allowable Emission Rates.'"

138.  PRSI operates the Refinery with the understanding that the total emission of air contaminants from the sources of emissions listed in Permit 20246's MAERT must not exceed the values stated on that table.

139.  PRSI makes a record of $PM_{10}$, CO, $NO_x$, $SO_2$, and VOC emissions that exceed the limits in Permit 20246's MAERT, to the extent PRSI is aware of such emissions.

140.  Each of the emission limits in Permit 20246 described above is an emission standard or limitation.

141.  Each of the emission limits in Permit 20246 described above is a permit term or condition.

142.  Each of the emission limits in Permit 20246 described above is a condition or requirement of a permit issued under part D of subchapter I of the CAA (relating to nonattainment).

143.  Permit 20246 was issued under Texas' SIP.

144.  A violation of Permit 20246 is a violation of the CAA.

**Permit 22039**

145.  PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Boiler #4.

16

146.  PRSI filed an application with TCEQ that asked for permission to emit certain pollutants from the Refinery's Boiler #6.

147.  In applying to TCEQ for permission to emit certain pollutants from the Refinery's Boiler #4 and Boiler #6, PRSI provided information to TCEQ for the purpose of enabling TCEQ to calculate maximum allowable emission rates.

148.  TCEQ issued Air Quality Permit 22039 to PRSI ("Permit 22039").

149.  PRSI accepted Permit 22039.

150.  PRSI did not appeal TCEQ's issuance of Permit 22039.

151.  PRSI understands that it is obligated to comply with the terms of Permit 22039.

152.  PRSI operates the Refinery with the understanding that Permit 22039 limits the emission of air pollutants.

153.  Permit 22039 limits the maximum number of pounds of $NO_x$ per million British Thermal Units ("lb/MMBtu") permitted to be emitted from Boiler #4.  This limit is expressed in the form of a maximum one-hour average for any load condition (excluding start-up and shutdown).  This limit is set forth in Special Condition 6 of Permit 22039.

154.  Permit 22039 limits the maximum number of lb/MMBtu of carbon monoxide permitted to be emitted from Boiler #4.  This limit is expressed in the form of a maximum one-hour average for any load condition (excluding start-up and shutdown).  This limit is set forth in Special Condition 6 of Permit 22039.

155.  Permit 22039 limits the maximum number of parts per million, volumetric dry ("ppmvd") of carbon monoxide, corrected to 3% oxygen, permitted to be emitted from Boiler #6. This limit is expressed in the form of a maximum block one-hour average for any load condition

(excluding start-up, shutdown, and maintenance).  This limit is set forth in Special Condition 6 of Permit 22039.

156.  PRSI operates the Refinery with the understanding that the amount of $NO_x$ and CO must not exceed the lb/MMBtu and ppmvd amounts set forth in Special Condition 6 of Permit 22039.

157.  PRSI makes a record of $NO_x$ and CO emissions that exceed the lb/MMBtu and/or ppmvd limits contained in Special Condition 6 of Permit 22039, to the extent PRSI is aware of such exceedances.

158.  Each of the emission limits in Permit 22039 described above is an emission standard or limitation.

159.  Each of the emission limits in Permit 22039 described above is a permit term or condition.

160.  Each of the emission limits in Permit 22039 described above is a condition or requirement of a permit issued under part D of subchapter I of the CAA (relating to nonattainment).

161.  Permit 22039 was issued under Texas' SIP.

162.  A violation of Permit 22039 is a violation of the CAA.

**Federal Operating Permit O1544**

163.  PRSI operates the Refinery with the understanding that it is required to have a CAA federal operating permit.

164.  Such federal operating permits are issued pursuant to Title V of the Clean Air Act.

165.  PRSI applied for a federal operating permit.

166.  PRSI submitted its application for a federal operating permit to TCEQ.

167.  In its federal operating permit application, PRSI identified certain Refinery units to be covered by the federal operating permit.

168.  On May 26, 2009, TCEQ transmitted to PRSI federal operating permit O1544 ("FOP O1544).  PRSI received FOP O1544 from TCEQ on or about May 26, 2009.

169.  FOP O1544 became effective on March 26, 2009.

170.  TCEQ issued FOP O1544 pursuant to Title V of the federal Clean Air Act.

171.  PRSI understands that it is obligated to comply with the terms of FOP O1544.

172.  Paragraph 17 in the "Special Terms and Conditions" section of FOP O1544 states in part, "Permit holder shall comply with the requirements of New Source Review authorizations issued or claimed by the permit holder for the permitted area."

173.  The "New Source Review authorizations" referred to in FOP O1544 include air quality permits issued by TCEQ that implement the New Source Review program under the Clean Air Act.

174.  FOP O1544 contains an attachment entitled, "New Source Review Authorization References."

175.  The "New Source Review Authorization" attachment in FOP O1544 states in part, "The New Source Review authorizations listed in the table below are applicable requirements under 30 TAC Chapter 122 and enforceable under this operating permit."

176.  The "New Source Review Authorization" attachment in FOP O1544 lists Permit 56389, Permit 20246, and Permit 22039.

177.  PRSI operates the Refinery with the understanding that FOP O1544 requires compliance with Permit 56389, Permit 20246, and Permit 22039.

178.  Each of the emission limits in Permit 56389, Permit 20246, and Permit 22039 described above are incorporated into FOP O1544 and are emission standards or limitations under a permit issued pursuant to subchapter V of the Clean Air Act.

179.  A violation of FOP O1544 is a violation of the Clean Air Act.

180.  PRSI did not file a timely application to renew FOP O1544.

181.  FOP O1544 expired on May 26, 2014.

182.  From March 27, 2014 through October 11, 2016, PRSI operated without an effective federal operating permit issued under Title V of the CAA.

183.  On August 18, 2014, and various subsequent dates, TCEQ issued a series of administrative orders requiring PRSI to comply with the terms and conditions of expired FOP O1544 until a new FOP is issued.

184.  PRSI applied for a new federal operating permit.

185.  PRSI submitted its application for a new federal operating permit to TCEQ.

186.  TCEQ transmitted to PRSI, and PRSI received, federal operating permit O3711 ("FOP O3711").

187.  FOP O3711 became effective on October 12, 2016.

188.  TCEQ issued FOP O3711 pursuant to Title V of the federal Clean Air Act.

189.  PRSI understands that it is obligated to comply with the terms of FOP O3711.

190.  FOP O3711 states that PRSI shall comply with the requirements of New Source Review authorizations issued for the permitted area.

191.  The New Source Review authorizations referred to in FOP O3711 include air quality permits issued by TCEQ that implement the New Source Review program under the Clean Air Act.

20

192.  FOP O3711 contains an attachment entitled, "New Source Review Authorization References."

193.  The "New Source Review Authorization References" attachment in FOP O3711 states that the New Source Review authorizations listed in the table below are applicable requirements under 30 TAC Chapter 122 and enforceable under this operating permit.

194.  The "New Source Review Authorization References" attachment in FOP O3711 lists Permit 56389, Permit 20246, and Permit 22039.

195.  PRSI operates the Refinery with the understanding that FOP O3711 requires compliance with Permit 56389, Permit 20246, and Permit 22039.

196.  Each of the emission limits in Permit 56389, Permit 20246, and Permit 22039 described above are incorporated into FOP O3711 and are emission standards or limitations under a permit issued pursuant to subchapter V of the Clean Air Act.

197.  A violation of FOP O3711 is a violation of the Clean Air Act.

## ADVERSE EFFECTS OF POLLUTANTS EMITTED BY THE REFINERY

### Particulate matter

198.  Particulate matter is one of the six "criteria pollutants" for which EPA has established minimum air quality levels in the form of "national ambient air quality standards" ("NAAQS") pursuant to 42 U.S.C. § 7409.

199.  Particulate matter is sometimes described as soot.

200.  Particulate matter is a mixture of extremely small particles and liquid droplets.

201.  Particulate matter typically is made up of components such as acids (*e.g.*, nitrates and sulfates), organic chemicals, metals, and soil or dust particles.

202.  Particulate matter emitted from the Refinery typically contains solids or liquid droplets that are so small that they can be inhaled.

203.  In general, the smaller the particle of particulate matter, the easier it is for the particle to travel deep into the human respiratory tract and reach the lungs.

204.  Inhalation of particulate matter can cause or exacerbate serious health problems.

205.  According to EPA, numerous scientific studies have linked exposure to airborne particulate matter to a variety of human health problems.

206.  Exposure to airborne particulate matter is linked to premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function, and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.  https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

207.  Even for healthy people, temporary symptoms of exposure to airborne particulate matter include irritation of the eyes, nose, and throat; coughing; phlegm; chest tightness; and shortness of breath.

208.  People with heart or lung diseases, children, and older adults are the most likely to be affected by exposure to airborne particulate matter.

209.  Airborne particulate matter causes or contributes to haze.

210.  Airborne particulate matter can be carried great distances by wind.

211.  Reductions in the concentrations of airborne particulate matter are beneficial to human health and the environment.

### *Sulfuric acid*

212.  Some of the particulate matter emitted by PRSI from the Refinery is sulfuric acid.

22

213.  Sulfuric acid has a pungent odor.

214.  The   Agency for Toxics Substances and Disease Registry stated,

Sulfuric acid and other acids are very corrosive and irritating and cause direct local effects on the skin, eyes, and respiratory and gastrointestinal tracts when there is direct exposure to sufficient concentrations. Breathing sulfuric acid mists can result in tooth erosion and respiratory tract irritation...If you touch sulfuric acid, it will burn your skin. If you get sulfuric acid in your eyes, it will burn your eyes and cause them to water. The term "burn" used in these sections refers to a chemical burn, not a physical burn resulting from contacting a hot object. People have been blinded by sulfuric acid when it was thrown in their faces.

*       *       *

When sulfuric acid is inhaled into the lungs in the form of small droplets that exist in air, these droplets are deposited within the lung and the ability of your respiratory tract to remove other small, unwanted particles may be decreased.

https://www.atsdr.cdc.gov/ToxProfiles/tp117-c1-b.pdf.

### ***Ammonium sulfate***

215.  Some of the particulate matter emitted by PRSI from the Refinery is ammonium sulfate.

216.  Ammonium sulfate can burn eyes and skin.

## **Sulfur dioxide**

217.  Sulfur dioxide is one of the six criteria pollutants for which EPA has established NAAQS pursuant to 42 U.S.C. § 7409.

218.  Exposure to airborne $SO_2$ can cause respiratory illness and other adverse effects on breathing.

219.  According to EPA, short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult.  https://www.epa.gov/so2-pollution/sulfur-dioxide-basics.

220.  Exposure to airborne $SO_2$ can cause alterations in pulmonary defenses.

221.  Exposure to airborne $SO_2$ can cause aggravation of existing cardiovascular disease.

222.  According to EPA, children, the elderly, and those who suffer from asthma are particularly sensitive to $SO_2$ exposure.  https://www.epa.gov/so2-pollution/sulfur-dioxide-basics. Children, the elderly, and people with asthma, cardiovascular disease, or chronic lung disease (such as bronchitis or emphysema) are particularly susceptible to the adverse health effects of $SO_2$.

223.  According to the federal Agency for Toxic Substances & Disease Registry ("ATSDR"):

Sulfur dioxide is severely irritating to the eyes, mucous membranes, skin, and respiratory tract.  Bronchospasm, pulmonary edema, pneumonitis, and acute airway obstruction can occur.

Inhalation exposure to very low concentrations of sulfur dioxide can aggravate chronic pulmonary diseases, such as asthma and emphysema.

*    *    *

[Upon acute exposure], [s]ulfur dioxide respiratory irritation induces symptoms such as sneezing, sore throat, wheezing, shortness of breath, chest tightness, and a feeling of suffocation.  Reflex laryngeal spasm and edema can cause acute airway obstruction…

[Chronic exposure to sulfur dioxide can result in] increased susceptibility to respiratory infections, symptoms of chronic bronchitis, and accelerated decline in pulmonary function.

ATSDR, "Medical Management Guidelines for Sulfur Dioxide.

https://www.atsdr.cdc.gov/MHMI/mmg116.pdf

224.  According to EPA, $SO_2$ emissions that lead to high concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ("SOx").  SOx can react with other compounds in the atmosphere to form small particles.  These particles contribute to particulate matter pollution: particles may penetrate deeply into sensitive parts of the lungs and cause additional health problems.  https://www.epa.gov/so2-pollution/sulfur-dioxide-basics.

24

225.  $SO_2$ and other sulfur oxides can react with other compounds in the atmosphere to form fine particles (also known as haze) that reduce visibility.

226.  $SO_2$ has a pungent odor.

227.  Reductions in the concentrations of airborne $SO_2$ are beneficial to human health and the environment.

**Carbon monoxide**

228.  Carbon monoxide is one of the six criteria pollutants for which EPA has established NAAQS pursuant to 42 U.S.C. § 7409.

229.  TCEQ describes the harmful effects of CO as follows:

CO can cause harmful health effects by reducing oxygen delivery to the body's organs and tissues.  Exposure to lower levels of CO is most serious for those who suffer from heart disease, and can cause chest pain, reduce the ability to exercise, or with repeated exposures, may contribute to other cardiovascular effects.

Even healthy people can be affected by high levels of CO.  People who breathe high levels of CO can develop vision problems, reduced ability to work or learn, reduced manual dexterity, and difficulty performing complex tasks.  At very high levels, CO is poisonous and can cause death.

http://www.tceq.state.tx.us/implementation/air/sip/texas-sip/criteria-pollutants/sip-co.

230.  CO contributes to the formation of ground-level ozone.

231.  Ozone is one of the six criteria pollutants for which EPA has established NAAQS pursuant to 42 U.S.C. § 7409.

232.  Ground-level ozone is also known as "smog."

233.  Reductions in the concentrations of airborne CO are beneficial to human health and the environment.

**Nitrogen oxides**

234.  Nitrogen oxides are one of the six criteria pollutants for which EPA has established NAAQS pursuant to 42 U.S.C. § 7409.

### *As a Contributor to Ground-Level Ozone*

235.  Nitrogen oxides ("$NO_x$") are a key component in the formation of ground-level ozone (smog).

236.  Relatively low levels of ground-level ozone can cause adverse health effects.

237.  Breathing ground-level ozone can trigger a variety of health problems, including chest pain, coughing, throat irritation, and airway inflammation.

238.  Breathing ground-level ozone can reduce lung function and harm lung tissue.  It can also worsen bronchitis, emphysema, and asthma, leading to a need for increased medical care.

239.  Breathing ground-level ozone can cause the muscles in the airways to constrict, trapping air in the alveoli.  This leads to wheezing and shortness of breath.

240.  Harris County is classified by EPA as being in a "nonattainment area" for the National Ambient Air Quality Standard established under the CAA for ground-level ozone.  This means that EPA has determined that this area commonly has concentrations of ground-level ozone that exceed (and thus violate) the national standard.

### *Other Health Effects of $NO_x$*

241.  Breathing air with a high concentration of $NO_x$ can irritate airways in the human respiratory system.

242.  Exposure to airborne $NO_x$ over short periods can aggravate respiratory diseases, particularly asthma, leading to respiratory symptoms (such as coughing, wheezing or difficulty breathing), hospital admissions, and visits to emergency rooms.

243.  Longer exposures to elevated concentrations of $NO_x$ may contribute to the development of asthma and potentially increase susceptibility to respiratory infections.

244.  People with asthma, as well as children and the elderly, are generally at greater risk for the health effects of $NO_x$.

245.  According to ATSDR, nitrogen oxides are

irritating to the upper respiratory tract and lungs even at low concentrations … Low concentrations initially may cause mild shortness of breath and cough … Chronic exposure to nitrogen oxides is associated with increased risk of respiratory infections in children.  Permanent restrictive and obstructive lung disease from bronchiolar damage may occur.

ATSDR, "Medical Management Guidelines for Nitrogen Oxides."

246.  Nitrogen dioxide, which is one type of nitrogen oxide, has an acrid smell.

247.  Reductions in the concentrations of airborne $NO_x$ are beneficial to human health and the environment.

**Volatile organic compounds**

248.  Volatile organic compounds ("VOCs") are a key component in the formation of ground-level ozone (or smog).

249.  Some VOCs are carcinogenic.

250.  Reductions in the concentrations of airborne VOCs are beneficial to human health and the environment.

## PRSI REPORTS TO TCEQ

**Reportable Emission Events**

251.  From time to time PRSI submits reports to the State of Texas Electronic Environmental Reporting System ("STEERS").

252.  TCEQ maintains the STEERS.

253.  PRSI submits reports to the STEERS to document certain "emissions events" that occur at the Refinery.

254.  "Emissions event" is defined in TCEQ rules in 30 Tex. Admin. Code § 101.1(28).

255.  PRSI submits reports to the STEERS that document releases of pollutants during emissions events at the Refinery that are above a certain threshold, known as a "reportable quantity."

256.  Emissions events that involve releases of pollutants above a reportable quantity are "reportable emissions events."

257.  PRSI is required to file reports of reportable emissions events on the STEERS pursuant to 30 Tex. Admin. Code §§ 101.1(88) & 101.201.

258.  These reports are sometimes called "STEERS reports."

259.  PRSI is required to file an initial STEERS report within 24 hours of an emission event.

260.  PRSI can amend an initial STEERS report within two weeks of the filing of the initial report.  Such an amended report is a "final" STEERS report.  If PRSI does not amend an initial STEERS report, the initial report becomes a final STEERS report after two weeks.

261.  TCEQ assigns an emissions event a "tracking number" once PRSI submits a STEERS report on it.

262.  PRSI's STEERS reports include information on the following:

    a.      The date and time the emissions event began.

    b.      The date and time the emissions event ended.

    c.      The cause of the emissions event.

    d.      The action taken by PRSI as a result of the emissions event.

e.     The emissions estimation method used to calculate the amount of emissions being reported.

f.     The source(s) of emissions that occurred as a result of the emissions event, identified by name and Emission Point Number ("EPN").

g.     The contaminants emitted as a result of the emissions event, separated by source.

h.     The applicable permit number governing the source(s) involved in the emissions event.  On the STEERS Report this is listed in the "Authorization" column.

i.     The authorized emission limit for the contaminant emitted.  On the STEERS Report this is listed in the "Limit" column.

(i)     From time to time PRSI states on its STEERS reports for the Refinery that the authorized emission limit for a contaminant is "0.0."

(ii)     PRSI states on its STEERS reports for the Refinery that a permit limit is "0.0" when a pollutant was not permitted to be emitted during the emissions event from the listed emission source.

j.     The amounts of each contaminant emitted during the emissions event, separated by emission source.  On the STEERS Report this is listed in the "Amount Released" column.

263.  The information in subparagraphs (a) through (j) of paragraph 262 that PRSI includes in STEERS reports is available to the public on TCEQ's website.

264.  PRSI is able to access TCEQ's website to view the publicly available information PRSI included in its STEERS reports.

265.  PRSI has reviewed Table 1 of the Notice Letter.

266.  Table 1 of the Notice Letter contains information PRSI provided to TCEQ in its STEERS Reports.

267.  Prior to the date this Complaint was filed, PRSI did not inform Plaintiffs that any of the information in Table 1 of the Notice Letter is incorrect.

268.  Plaintiffs have identified two typographical errors in Table 1.  The tracking number for an emissions event that occurred on 5/12/12 is listed as "167382"; the correct tracking number is 168372.  The tracking number for an emissions event that occurred on 10/2/16 is listed as "244871"; the correct tracking number is 244870.

269.  Information from PRSI's STEERS Reports regarding each of the emissions events referenced in Table 1 of the Notice Letter has been posted on TCEQ's website and is available to the public.

270.  The STEERS information on TCEQ's website regarding each of the emissions events referenced in Table 1 of the Notice Letter is in Exhibit 3, attached hereto.

271.  PRSI submitted to TCEQ the information in Exhibit 3.

272.  Exhibit 3 contains the publicly available versions of certain PRSI STEERS reports for the Refinery.

273.  Every reportable emission event involves an emission of one or more air pollutants in an amount that was not authorized by any permit or regulation.  Tex. Health & safety Code § 382.0215(a)(1); 30 Tex. Admin. Code §§ 101.1(28) & 101.1(108).

**Recordable Emission Events**

274.  PRSI maintains records of pollutant releases during Refinery emissions events that involve releases of pollutants below a reportable quantity.

275.  Emissions events that involve releases of pollutants below a reportable quantity are

30

"recordable emissions events."

276.  PRSI maintains records of recordable emissions events that occur at the Refinery.

277.  PRSI is required to maintain records of recordable emissions events at the Refinery pursuant to 30 Tex. §101.201(b).

278.  PRSI's records of recordable emissions events at the Refinery specify, among other things, the start date and duration of the emissions event; the name of the process unit or area that experienced the emissions event; the amount of each contaminant released during the event; and the governing emission limit.

279.  Every recordable emissions event involves an emission of one or more air pollutants in an amount that was not authorized by any permit or regulation.  Tex. Health & safety Code § 382.0215(a)(1); 30 Tex. Admin. Code §§ 101.1(28) & 101.1(108).

**Quarterly Reports**

280.  PRSI submits quarterly reports to TCEQ summarizing any periods of non-compliance at Boiler #4 and Boiler #6 with the limits for $NO_x$ and CO set forth in Special Condition 6 of Permit 22039.

281.  In these quarterly reports, PRSI specifies the year, the quarter, the total number of hours of $NO_x$ and CO limit violations, and the percentage of operating time the $NO_x$ and CO limits were violated.

282.  In these quarterly reports, PRSI provides an attachment called "Boiler Performance Data" showing hourly $NO_x$ and CO levels and hourly compliance information for each day in the quarter.

## COUNT I:  VIOLATIONS OF HOURLY EMISSION LIMITS
## DURING EMISSION EVENTS

283.  Paragraphs 1 through 282 are re-alleged and incorporated by reference herein.

**Sulfur Dioxide Emissions From The West Flare**

284.  The MAERT in Permit 56389 contains an 11.86 lbs/hr emission rate limit for sulfur dioxide emissions from the Refinery's West Flare.

285.  The West Flare is identified as Emission Point Number ("EPN") "FLRFNWEST."

286.  On the following dates listed in Plaintiffs' Notice Letter, PRSI emitted sulfur dioxide from the West Flare at an emission rate greater than 11.86 lbs/hr:  12/12/16, 11/3/16, 1/28/16, 1/2/16, 3/3/15, 5/28/14, and 1/16/14 – 1/17/14.

287.  On the following dates after Plaintiffs' Notice Letter, PRSI emitted sulfur dioxide from the West Flare at an emission rate greater than 11.86 lbs/hr:  12/23/16 – 12/24/16, 1/2/17, 1/4/17, and 1/7/17 – 1/8/17.

288.  The emissions identified in paragraphs 286 and 287 occurred during emissions events at the Refinery.

289.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraphs 286 and 287.

290.  Table 1 of the Notice Letter identifies the tracking number of each emissions event that occurred on the dates set forth in paragraph 286.

291.  The tracking numbers for the emissions events listed in paragraph 287 are, respectively:  249396, 249671, 249740, and 250081.

292.  Exhibit 3 contains the publicly available versions of PRSI's STEERS reports for the emissions events described in paragraphs 286 and 287.

293.  PRSI violated Permit 56389 when it emitted SO$_2$ from the West Flare during the emissions events that occurred on the dates identified in this Count.

294.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP O3711 after October 12, 2016, when it emitted SO$_2$ from the West Flare during the emissions events that occurred on the dates identified in this Count.

**VOC Emissions From The Alky Cooling Tower**

295.  The MAERT in Permit 56389 contains a 9.60 lbs/hr emission rate limit for total VOC emissions from the Refinery's Alky Cooling Tower.

296.  The Alky Cooling Tower is identified as EPN "FUCTWALK."

297.  On the following dates PRSI emitted total VOCs from the Alky Cooling Tower at an emission rate greater than 9.60 lbs/hr:  10/31/15 – 11/2/15 and 10/21/15 – 10/22/15.

298.  The emissions identified in the preceding paragraph occurred during emissions events at the Refinery.

299.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraph 297.

300.  Table 1 of the Notice Letter identifies the tracking number of each emissions event that occurred on the dates set forth in paragraph 297.

301.  PRSI violated Permit 56389 when it emitted VOCs from the Alky Cooling Tower during emissions events on the dates identified in this Count.

302.  PRSI violated FOP O1544 when it emitted VOCs from the Alky Cooling Tower on the dates identified in this Count.

**VOC Emissions From The Crude Unit**

303.  Fugitive emissions are emissions of air pollutants into the atmosphere that could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening designed to direct or control its flow.  30 Tex. Admin. Code § 101.1(39).

304.  The MAERT in the June 30, 2011, amended version of Permit 56389, which was in effect in July 2012, contained an 11.72 lbs/hr emission rate limit for fugitive total VOC emissions from the Refinery's Crude Unit.

305.  The MAERT in the August 15, 2012, amended version of Permit 56389, which was in effect in August 2015, contained an 11.77 lbs/hr emission rate limit for fugitive total VOC emissions from the Refinery's Crude Unit.

306.  The Crude Unit is identified as EPN "FUCRU001."

307.  On the following dates PRSI emitted fugitive total VOCs from the Crude Unit at an emission rate greater than 11.77 lbs/hr and 11.72 lbs/hr, respectively:  8/23/15 – 8/26/15 and 7/17/12.

308.  The emissions identified in the preceding paragraph occurred during emissions events at the Refinery.

309.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraph 307.

310.  Table 1 of the Notice Letter identifies the tracking number of each emissions event that occurred on the dates set forth in paragraph 307.

311.  PRSI violated Permit 56389 when it emitted VOCs from the Crude Unit during emissions events on the dates identified in this Count.

312.  PRSI violated FOP O1544 when it emitted VOCs from the Crude Unit on the dates identified in this Count.

**VOC Emissions From The East and West Flares**

313.  The MAERT in Permit 56389 contains a 239.81 lbs/hr emission rate limit for total VOC emissions from the Refinery's East and West Flares.

314.  The West Flare is identified as EPN "FLRFNWEST" and the East Flare is identified as EPN "FLRFNEAST."

315.  On the following dates PRSI emitted total VOCs from either the East or the West Flare at an emission rate greater than 239.81 lbs/hr:  8/14/12, 7/17/12, 6/14/12, and 5/12/12.

316.  In its STEERS report for the emission event occurring on 7/17/12 (tracking number 171159), PRSI listed the applicable emission limit for total VOC emissions from the East Flare as 239.39 lbs/hr.  On information and belief, this was a typographical or other error.  The applicable emission rate on this date was 239.81 lbs/hr.

317.  In its STEERS report for the emission event occurring on 6/14/12 (tracking number 169753), PRSI listed the applicable emission limit for total VOC emissions from the East Flare as 39.80 lbs/hr.  On information and belief, PRSI erroneously listed the MAERT limit from an earlier version of Permit 56389, which was not longer in effect.  The applicable emission rate on this date was 239.81 lbs/hr.

318.  The emissions identified in the paragraph 315 occurred during emissions events at the Refinery.

319.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraph 315.

320.  Table 1 of the Notice Letter identifies the tracking number of each emissions event that occurred on the dates set forth in paragraph 315.

321.  PRSI violated Permit 56389 when it emitted VOCs from the East and West Flares during emissions events on the dates identified in this Count.

322.  PRSI violated FOP O1544 when it emitted VOCs from the East and West Flares on the dates identified in this Count.

**PM$_{10}$ Emissions From The Seal Pot**

323.  Special Condition 2 and the MAERT of Permit 20246 prohibit emissions of pollutants from the FCC Seal Pot, except during cold start-ups of the FCC Unit.  During cold start-ups, but only up to a maximum of 38 hours per year, PM$_{10}$ is allowed to be emitted at a maximum hourly rate of 214 lbs/hr and a maximum annual rate of 2.57 tons/year.

324.  Under Permit 20246 the hourly emission rate limit for PM$_{10}$ from the Seal Pot during a time that is not a cold start-up is 0 lbs/hr.

325.  The Seal Pot is identified as EPN "VTFCC003."

326.  PRSI sometimes refers to EPN VTFCC003 in its STEERS Reports as the "Seal Pot Stack."

327.  On the following dates PRSI emitted PM$_{10}$ from the Seal Pot during a time that was not a cold start-up:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15, 8/23/15 –8/26/15, 6/1/15 – 6/4/15, 3/3/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 – 7/12/14, 6/18/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 – 9/2/13, and 8/10/13.

328.  On the following dates PRSI emitted PM$_{10}$ from the Seal Pot at an emission rate greater than 0 lbs/hr:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15,

8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 3/3/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 – 7/12/14, 6/18/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 – 9/2/13, and 8/10/13.

329.  The emissions identified in the preceding two paragraphs occurred during emissions events at the Refinery.

330.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraphs 327 and 328.

331.  Table 1 of the Notice Letter identifies the tracking number of each emission event that occurred on the dates set forth in paragraphs 327 and 328.

332.  PRSI violated Permit 20246 when it emitted particulate matter from the Seal Pot during emissions events on the dates identified in this Count.

333.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP O3711 after October 12, 2016, when it emitted particulate matter from the Seal Pot on the dates identified in this Count.

**Carbon Monoxide Emissions From The Seal Pot**

334.  Carbon monoxide is not permitted to be emitted from the Seal Pot.

335.  Because Permit 20246 does not authorize CO emissions from the Seal Pot, the emission rate limit for CO from the Seal Pot is 0 lbs/hr.

336.  On the following dates PRSI emitted CO from the Seal Pot:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15, 12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 9/8/14, 9/7/14 – 9/8/14, and 7/8/14 – 7/12/14.

337.  On the following dates PRSI emitted CO from the Seal Pot at an emission rate greater than 0 lbs/hr:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15,

12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 9/8/14, 9/7/14 – 9/8/14, and 7/8/14 – 7/12/14.

338.  The emissions identified in the preceding two paragraphs occurred during emissions events at the Refinery.

339.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraphs 336 and 337.

340.  Table 1 of the Notice Letter identifies the tracking number of each emission event that occurred on the dates set forth in paragraphs 336 and 337.

341.  PRSI violated Permit 20246 when it emitted CO from the Seal Pot during emissions events on the dates identified in this Count.

342.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP O3711 after October 12, 2016, when it emitted CO from the Seal Pot on the dates identified in this Count.

**Nitrogen Oxides Emissions From The Seal Pot**

343.  Nitrogen oxides ("NOx") are not permitted to be emitted from the Seal Pot.

344.  Because Permit 20246 does not authorize $NO_x$ emissions from the Seal Pot, the emission rate limit for nitrogen oxides from the Seal Pot is 0 lbs/hr.

345.  On the following dates PRSI emitted $NO_x$ from the Seal Pot:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15, 12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 – 7/12/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 – 9/2/13, and 8/10/13.

346.  On the following dates PRSI emitted $NO_x$ from the Seal Pot at an emission rate greater than 0 lbs/hr:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15,

12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 –

7/12/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 – 9/2/13, and 8/10/13.

347.  The emissions identified in the preceding two paragraphs occurred during emissions

events at the Refinery.

348.  PRSI submitted STEERS Reports for the emissions events that occurred on the

dates identified in paragraphs 345 and 346.

349.  Table 1 of the Notice Letter identifies the tracking number of each emission event

that occurred on the dates set forth in paragraphs 345 and 346.

350.  PRSI violated Permit 20246 when it emitted $NO_x$ from the Seal Pot during

emissions events on the dates identified in this Count.

351.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP

O3711 after October 12, 2016, when it emitted $NO_x$ from the Seal Pot on the dates identified in

this Count.

**Sulfur Dioxide Emissions From The Seal Pot**

352.  Sulfur dioxide ("$SO_2$") is not permitted to be emitted from the Seal Pot.

353.  Because Permit 20246 does not authorize $SO_2$ emissions from the Seal Pot, the

emission rate limit for $SO_2$ from the Seal Pot is 0 lbs/hr.

354.  On the following dates PRSI emitted $SO_2$ from the Seal Pot:  11/3/16, 7/25/16 –

7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15, 12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15

– 6/4/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 – 7/12/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 –

9/2/13, and 8/10/13.

355.  On the following dates PRSI emitted $SO_2$ from the Seal Pot at an emission rate

greater than 0 lbs/hr:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15,

12/13/15 – 12/16/15, 8/23/15 – 8/26/15, 6/1/15 – 6/4/15, 9/8/14, 9/7/14 – 9/8/14, 7/8/14 –

7/12/14, 5/2/14 – 5/3/14, 4/21/14 – 4/22/14, 9/1/13 – 9/2/13, and 8/10/13.

356.  The emissions identified in the preceding two paragraphs occurred during emissions

events at the Refinery.

357.  PRSI submitted STEERS Reports for the emissions events that occurred on the

dates identified in paragraphs 354 and 355.

358.  Table 1 of the Notice Letter identifies the tracking number of each emission event

that occurred on the dates set forth in paragraphs 354 and 355.

359.  PRSI violated Permit 20246 when it emitted $SO_2$ from the Seal Pot during

emissions events on the dates identified in this Count.

360.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP

O3711 after October 12, 2016, when it emitted $SO_2$ from the Seal Pot on the dates identified in

this Count.

**VOC Emissions From The Seal Pot**

361.  VOCs are not permitted to be emitted from the Seal Pot.

362.  Because Permit 20246 does not authorize VOC emissions from the Seal Pot, the

emission rate limit for VOCs from the Seal Pot is 0 lbs/hr.

363.  On the following dates PRSI emitted VOCs from the Seal Pot:  11/3/16, 7/25/16 –

7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15, 12/13/15 – 12/16/15, 8/23/15 – 8/26/15, and

6/1/15 – 6/4/15.

364.  On the following dates PRSI emitted VOCs from the Seal Pot at an emission rate

greater than 0 lbs/hr:  11/3/16, 7/25/16 – 7/31/16, 7/16/16 – 7/17/16, 12/19/15 – 12/20/15,

12/13/15 – 12/16/15, 8/23/15 – 8/26/15, and 6/1/15 – 6/4/15.

365.  The emissions identified in the preceding two paragraphs occurred during emissions events at the Refinery.

366.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates identified in paragraphs 363 and 364.

367.  Table 1 of the Notice Letter identifies the tracking number of each emissions event that occurred on the dates set forth in paragraphs 363 and 364.

368.  PRSI violated Permit 20246 when it emitted VOCs from the Seal Pot during emissions events on the dates identified in this Count.

369.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP O3711 after October 12, 2016, when it emitted VOCs from the Seal Pot on the dates identified in this Count.

**Particulate Matter Emissions From The Electrostatic Precipitator Stack (HTBLR010)**

370.  The MAERT in Permit 20246 contains a 34.80 lbs/hr emission rate limit for $PM_{10}$ from the source named "CO Boiler" when emissions from that source are controlled by the Electrostatic Precipitator ("ESP").

371.  The emission point number for CO Boiler emissions controlled by the ESP is identified in Permit 20246 as "HTBLR010."

372.  In its STEERS Reports, PRSI variously identifies EPN HTBLR010 as the "Electrostatic Precipitator Stack," the "ESP Stack," "Boiler 10," and "Boiler #10."

373.  On the following dates listed in Plaintiffs' Notice Letter, PRSI emitted $PM_{10}$ from EPN HTBLR010, when emissions were being controlled by the ESP, at an emission rate greater than 34.80 lbs/hr:  11/3/16, 11/3/16 – 11/6/16, 10/11/16 – 10/13/16, 10/2/16, 1/2/16, 1/28/16, 8/26/15, 2/20/15, 1/5/15, 9/8/14, 9/7/14 – 9/8/14, 7/23/14, 5/20/14, 5/2/14 – 5/3/14, 4/21/14 –

4/22/14, 10/27/13, 10/1/12, 9/30/12 (on two separate occasions), 9/29/12, 8/30/12, 8/23/12 –

8/24/12, 4/3/12 – 4/4/12, and 1/20/12.

374.  On the following date that was inadvertently omitted from Plaintiffs' Notice Letter,

PRSI emitted $PM_{10}$ from EPN HTBLR010, when emissions were being controlled by the ESP, at

an emission rate greater than 34.80 lbs/hr:  12/7/15.

375.  On the following date after Plaintiffs' Notice Letter, PRSI emitted $PM_{10}$ from EPN

HTBLR010, when emissions were being controlled by the ESP, at an emission rate greater than

34.80 lbs/hr:  1/4/17.

376.  The emissions identified in the preceding three paragraphs occurred during

emissions events at the Refinery.

377.  PRSI submitted STEERS Reports for the emissions events that occurred on the dates

identified in paragraphs 373-75.

378.  Table 1 of the Notice Letter identifies the tracking number of each emission event

that occurred on the dates set forth in paragraphs 373-75.

379.  The tracking numbers of the emissions events that occurred on 12/7/15 and 1/4/17

are 223456 and 249740, respectively.

380.  Exhibit 3 contains the publicly available versions of PRSI's STEERS reports for the

emissions events described in paragraphs 373-75.

381.  PRSI violated Permit 20246 when it emitted particulate matter from EPN

HTBLR010 during emissions events on the dates identified in this Count.

382.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP

O3711 after October 12, 2016, when it emitted particulate matter from the ESP on the dates

identified in this Count.

383.  Any emissions of the types described in this Count I that occurred during recordable emission events, or that occurred during reportable emission events after the date of the Notice Letter and may occur after the date of this Complaint, also constitute violations of Permit 56389, 20246, FOP O1544, and FOP O3711.

## COUNT II:  VIOLATIONS OF ANNUAL EMISSION LIMITS

384.  Paragraphs 1 through 383 are re-alleged and incorporated by reference herein.

385.  Special Condition 2 and the MAERT for Permit 20246 prohibit $PM_{10}$ emissions from the Seal Pot that exceed 2.57 tons, as calculated on a rolling 12-month period ("Seal Pot $PM_{10}$ annual limit").

386.  PRSI's emissions of $PM_{10}$ from the Seal Pot during reported emissions events are listed on PRSI's STEERS reports.

387.  Totaling the reported emissions of $PM_{10}$ listed on PRSI's STEERS reports shows that PRSI has emitted more than 2.57 tons of $PM_{10}$ from the Seal Pot, as calculated on a rolling 12-month period, continuously since June 2014.

388.  The rolling 12-month total, in pounds and in tons, of $PM_{10}$ emitted from the Seal Pot during reported STEERS events was as follows during the months indicated:

| MONTH/YEAR | 12-MONTH ROLLING TOTAL (lbs.) | 12-MONTH ROLLING TOTAL (tons) |
|---|---|---|
| a. Jun-2014 | 20,299.02 | 10.15 |
| b. Jul-2014 | 23,134.00 | 11.57 |
| c. Aug-2014 | 22,529.82 | 11.26 |
| d. Sep-2014 | 65,672.82 | 32.84 |
| e. Oct-2014 | 65,672.82 | 32.84 |
| f. Nov-2014 | 65,672.82 | 32.84 |
| g. Dec-2014 | 65,672.82 | 32.84 |
| h. Jan-2015 | 65,672.82 | 32.84 |
| i. Feb-2015 | 65,672.82 | 32.84 |

| | | |
|---|---|---|
| j. Mar-2015 | 65,759.22 | 32.88 |
| k. Apr-2015 | 65,086.72 | 32.54 |
| l. May-2015 | 64,924.40 | 32.46 |
| m. Jun-2015 | 84,757.40 | 42.38 |
| n. Jul-2015 | 81,922.40 | 40.96 |
| o. Aug-2015 | 84,154.40 | 42.08 |
| p. Sep-2015 | 40,711.40 | 20.36 |
| q. Oct-2015 | 40,711.40 | 20.36 |
| r. Nov-2015 | 40,711.40 | 20.36 |
| s. Dec-2015 | 77,859.40 | 38.93 |
| t. Jan-2016 | 77,859.40 | 38.93 |
| u. Feb-2016 | 77,859.40 | 38.93 |
| v. Mar-2016 | 77,773.00 | 38.89 |
| w. Apr-2016 | 77,773.00 | 38.89 |
| x. May-2016 | 77,773.00 | 38.89 |
| y. Jun-2016 | 39,380.00 | 19.69 |
| z. Jul-2016 | 82,181.50 | 41.09 |
| aa. Aug-2016 | 79,949.50 | 39.97 |
| bb. Sept-2016 | at least 79,949.50 | at least 39.97 |
| cc. Oct-2016 | at least 79,949.50 | at least 39.97 |
| dd. Nov-2016 | at least 79,949.50 | at least 39.97 |
| ee. Dec-2016 | at least 79,949.50 | at least 39.97 |
| ff. Jan-2017 | at least 79,949.50 | at least 39.97 |

389.  PRSI violated Permit 20246 when it exceeded the Seal Pot $PM_{10}$ annual limit.

390.  PRSI violated Permit FOP O1544 before October 12, 2016, and violated FOP O3711 after October 12, 2016, when it exceeded the Seal Pot $PM_{10}$ annual limit.

391.  PRSI will continue to exceed the Seal Pot $PM_{10}$ annual limit after the date this Complaint is filed.

392.  Each day on which PRSI is in violation of the Seal Pot $PM_{10}$ annual limit is a separate day of violation under the CAA.

## COUNT III:  VIOLATIONS OF HOURLY LIMITS AT BOILERS #4 AND #6

393.  Paragraphs 1 through 392 are re-alleged and incorporated by reference herein.

### NOx Emissions From Boiler #4

394.  Special Condition 6 of Permit 22039 sets a limit of 0.06 lb/MMBtu of $NO_x$ as a maximum one-hour average for any load condition for emissions from Boiler #4, excluding start-up and shutdown conditions ("the Boiler #4 $NO_x$ limit").

395.  Boiler #4 is identified as EPN "HTBLR004."

396.  PRSI exceeded the Boiler #4 $NO_x$ limit in the following calendar quarters:

    a.    2011:  Quarter 4

    b.    2012:  Quarters 1, 2 and 4

    c.    2013:  Quarters 1, 2, and 3

    d.    2014:  Quarters 1 and 3.

397.  PRSI's quarterly summary reports for the calendar quarters listed in the preceding paragraph, describing PRSI's non-compliance with the Boiler #4 $NO_x$ limit, are in Exhibit 4, attached hereto.

398.  The total number of hours and total percentage of operating time that $NO_x$ emissions exceeded the Boiler #4 $NO_x$ limit were as follows for the quarters indicated:

| | YEAR | Q | HOURS | % OPERATING TIME |
|---|---|---|---|---|
| a. | 2011 | Q4 | 231 | 12.2% |
| b. | 2012 | Q1 | 707 | 32.4% |
| c. | 2012 | Q2 | 1,052 | 57.8% |
| d. | 2012 | Q4 | 1,676 | 77.5% |
| e. | 2013 | Q1 | 1,282 | 59.6% |
| f. | 2013 | Q2 | 793 | 36.3% |
| g. | 2013 | Q3 | 386 | 18.4% |
| h. | 2014 | Q1 | 707 | 36.5% |
| i. | 2014 | Q3 | 42 | 1.92% |

399.  PRSI violated Permit 22039 when it exceeded the Boiler #4 $NO_x$ limit as set forth in paragraph 398.

400.  PRSI violated FOP O1544 when it exceeded the Boiler #4 $NO_x$ limit as set forth in paragraph 398.

401.  Each day on which PRSI exceeded the Boiler #4 $NO_x$ limit is a separate day of violation under the CAA.

**Carbon Monoxide Emissions From Boiler #4**

402.  Special Condition 6 of Permit 22039 sets a limit of 0.07 lb/MMBtu of CO as a maximum one-hour average for any load condition for emissions from Boiler #4, excluding start-up and shutdown conditions ("the Boiler #4 CO limit").

403.  PRSI exceeded the Boiler #4 CO limit in the following calendar quarters:

a.      2011:  Quarter 4

b.      2012:  Quarters 2 and 4

c.      2013:  Quarters 1 and 3

d.      2014:  Quarters 1 and 3.

404.  PRSI's quarterly summary reports for the calendar quarters listed in the preceding paragraph, describing PRSI's non-compliance with the Boiler #4 CO limit, are in Exhibit 4, attached hereto.

405.  The total number of hours and total percentage of operating time that CO emissions exceeded the Boiler #4 CO limit were as follows for the quarters indicated:

| | YEAR | Q | HOURS | % OPERATING TIME |
|---|---|---|---|---|
| a. | 2011 | Q4 | 16 | 0.8% |
| b. | 2012 | Q2 | 90 | 4.95% |
| c. | 2012 | Q4 | 169 | 7.8% |
| d. | 2013 | Q1 | 5 | 0.2% |

|   |      |    |    |       |
|---|------|----|----|-------|
| e. | 2013 | Q3 | 8  | 0.04% |
| f. | 2014 | Q1 | 7  | 0.4%  |
| g. | 2014 | Q3 | 35 | 1.6%  |

406.  PRSI violated Permit 22039 when it exceeded the Boiler #4 CO limit as set forth in paragraph 405.

407.  PRSI violated FOP O1544 when it exceeded the Boiler #4 CO limit as set forth in paragraph 405.

408.  Each day on which PRSI exceeded the Boiler #4 CO limit is a separate day of violation under the CAA.

**Carbon Monoxide Emissions From Boiler #6**

409.  Special Condition 6 of Permit 22039 sets a limit of 50 ppmvd of CO as a maximum one-hour average for any load condition (excluding start-up and shutdown) for emissions from Boiler #6, corrected to 3% oxygen ("the Boiler #6 CO limit").

410.  PRSI exceeded the Boiler #6 CO limit in the following calendar quarters:

a.  2011:  Quarter 4

b.  2012:  Quarters 1 and 3

c.  2013:  Quarters 1 and 4

d.  2014:  Quarters 1, 2, 3, and 4.

411.  PRSI's quarterly summary reports for the calendar quarters listed in the preceding paragraph, describing PRSI's non-compliance with the Boiler #6 CO limit, are in Exhibit 4, attached hereto.

412.  The total number of hours and total percentage of operating time that CO emissions exceeded the Boiler #6 CO limit was as follows for the quarters indicated:

|     | YEAR | Q  | HOURS | % OPERATING TIME |
|-----|------|----|-------|------------------|
| a.  | 2011 | Q4 | 165   | 13.6%            |
| b.  | 2012 | Q1 | 64    | 3.62%            |
| c.  | 2012 | Q3 | 409   | 18.58%           |
| d.  | 2013 | Q1 | 27    | 1.3%             |
| e.  | 2013 | Q4 | 97    | 5.14%            |
| f.  | 2014 | Q1 | 197   | 9.1%             |
| g.  | 2014 | Q2 | 465   | 21.62%           |
| h.  | 2014 | Q3 | 74    | 3.7%             |
| i.  | 2014 | Q4 | 30    | 1.4%             |

413.  PRSI violated Permit 22039 when it exceeded the Boiler #6 CO limit as set forth in paragraph 412.

414.  PRSI violated FOP O1544 when it exceeded the Boiler #6 CO limit as set forth in paragraph 412.

415.  Each day on which PRSI exceeded the Boiler #6 CO limit is a separate day of violation under the CAA.

416.  Any additional exceedances of the three emission limits described in this Count III that occurred after December 22, 2011, also constitute violations of Permit 22039, FOP O1544, and FOP O3711.

## AIR POLLUTION FROM THE REFINERY HARMS PLAINTIFFS' MEMBERS

417.  Plaintiffs have members who live and work in the neighborhoods near the Refinery.

418.  Plaintiffs have members who breathe illegal emissions from the Refinery.

419.  Plaintiffs have members who can see air pollution coming from the Refinery. Plaintiffs have members who are bothered by this visible air pollution and have modified their behavior because of it.

48

420. Plaintiffs have members who see a thick haze that sometimes hangs above the Refinery and nearby neighborhoods. Plaintiffs have members who are bothered by this haze and have modified their behavior because of it.

421. Plaintiffs have members who can smell air pollution from the Refinery. The smells can be severe. The types of odors emanating from the Refinery that Plaintiffs' members smell include: a rotten egg odor, an odor like something burning, and chemical odors. The odors become stronger closer to the Refinery and when the wind is blowing toward them from the direction of the Refinery.

422. Plaintiffs have members who live and work near the Refinery and who, along with their families, suffer from: asthma, headaches, running nose, sneezing, coughing, and watering eyes, among other conditions. These conditions typically lessen or disappear when Plaintiffs' members who live and work near the Refinery leave the area for vacations or to visit friends and relatives out of the area.

423. Plaintiffs have members who suffer from symptoms that are consistent with many of the symptoms caused by exposure to the air pollutants described in paragraphs 198-250 above.

424. Plaintiffs' members and their families have had to restrict their outdoor activities as a result of air pollution from the Refinery.

425. Plaintiffs' members who live and work near the Refinery are deeply concerned by the warnings they have received to shelter in place as a result of emission events at the Refinery, and by the media reports they have read, seen, or heard regarding releases of harmful pollutants from the Refinery into their neighborhoods, and by the information they have received directly from PRSI officials regarding releases of air pollutants from the Refinery.

426.  Plaintiffs have members who worry that they or their families suffer an increased risk of cancer as a result of the Refinery's illegal air pollution.

427.  Plaintiffs' members who live near the Refinery and throughout Harris County and other nearby counties are bothered by ground-level ozone and want there to be as little of it as possible.

428.  Plaintiffs have members who live near the Refinery and are concerned that the Refinery will again have fires and explosions.

429.  Plaintiffs have members who are aware that the Refinery illegally emits pollutants. Plaintiffs have members who are worried that in the future they will breathe illegal emissions from the Refinery, and that future illegal emissions will result in the formation of dangerous ozone, create serious health problems, and interfere with their ability to carry on ordinary activities.

430.  Plaintiffs have members who want to breathe as little of the Refinery's pollution as possible, and certainly no illegal pollution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.  Declare PRSI to have violated and to be in continuing violation of the CAA and PRSI's permits;

2.  Permanently enjoin PRSI from operating all stationary sources of air pollutants at the Refinery except in compliance with the CAA and any applicable permits and regulatory requirements;

3.  Order PRSI to take appropriate actions to remedy, mitigate, or offset the harm to public health and the environment caused by the violations of the CAA and PRSI's permits as alleged above;

4.  Appoint a special master at PRSI's expense to oversee PRSI's compliance with the CAA and PRSI's permits at the Refinery;

5.  Assess a civil penalty against PRSI for each day of violation of the CAA and of applicable permits and regulations occurring during the applicable statute of limitations period (five years prior to December 22, 2016), as provided by 42 U.S.C. §§ 7413(e) and 7604(a) and (g) and federal regulations;

5.  Order Defendants to pay reasonable attorneys' fees and costs (including expert witness fees), as provided by 42 U.S.C. § 7604(d); and

6.  Grant such other relief as the Court deems just and proper.

Dated:  March 2, 2017

/s/ Philip H. Hilder
Philip H. Hilder
State Bar No. 09620050
Southern District of Texas Bar No. 2474
William B. Graham
State Bar No. 24053236
Southern District of Texas Bar No. 1132514
Hilder & Associates, P.C.
819 Lovett Blvd.
Houston, Texas  77006-3905
(713) 655-9111 (phone)
(713) 655-9112 (fax)

PHILIP H. HILDER:
ATTORNEY-IN-CHARGE
FOR PLAINTIFFS

/s/ David A. Nicholas
S.D. Tex. Bar No. 89667
20 Whitney Road
Newton, Massachusetts  02460
(617) 964-1548 (phone)
(617) 663-6233

Joshua R. Kratka
S.D. Tex. Bar No. 962922
National Environmental Law Ctr.
294 Washington Street, Suite 500
Boston, Massachusetts  02108
(617) 747-4333 (phone)
(617) 292-8057 (fax)